IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN M. GEORGE, | ) | Case No. 1:16-cv-2044 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

**I.     Introduction**

Plaintiff Steven M. George seeks judicial review of the final decision of the

Commissioner of Social Security ("Commissioner") denying his application for disability

insurance benefits ("DIB") under Title II of the Social Security Act.  This matter is before the

court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

Because the ALJ did not support her invalidation of George's IQ scores at Step Three

with substantial evidence and did not apply the applicable regulatory standards, I recommend

that the final decision of the Commissioner be VACATED and that the matter be REMANDED

for further proceedings.

**II.     Procedural History**

In 2013, George filed an application for DIB, alleging he became disabled on April 1,

2009.  (Tr. 144-45).  After the Social Security Administration denied his application, he attended

a hearing before Administrative Law Judge Tammy Georgian ("ALJ").  (Tr. 40-115)  On April 3,

2015, the ALJ denied George's claim for benefits.  (Tr. 15-39)  The Appeals Council declined to

review the case.  (Tr. 1-5)

## III.  Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability. "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy[1]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.   If claimant is not doing substantial gainful activity, his impairment must be
    severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe
    impairment that has lasted or is expected to last for a continuous period of at
    least twelve months, and his impairment meets or equals a listed impairment,
    claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must
    assess the claimant's residual functional capacity and use it to determine if
    claimant's impairment prevents him from doing past relevant work. If

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in
the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy. *Id.*

## IV. The ALJ's Decision

The ALJ issued a decision on April 3, 2015. A summary of her findings are as follows:

1. George last met the insured status requirements of the Social Security Act on December 31, 2014. (Tr. 20)

2. George did not engage in substantial gainful activity during the period from his alleged onset date of April 1, 2009, through his date last insured of December 31, 2014. (Tr. 20)

3. George had the following severe impairments: anxiety disorder, affective disorder, borderline intellectual functioning, and substance addiction disorder. (Tr. 20)

4. Through the date last insured, George did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 21)

5. George had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: could perform simple and routine tasks, but not a production rate pace, such as assembly line work. In addition, George can tolerate only occasional exposure to changes in the work setting, decision-making, and superficial contact with supervisors, coworkers, and the public. (Tr. 25)

6. Through the date last insured, George was capable of performing past relevant work as a lens grinder. This work did not require the performance of work-

related activities precluded by his RFC.  (Tr. 33)

Based on these findings, the ALJ determined that George had not been under a disability at any time from the alleged onset date of April 1, 2009, through his date last insured of December 31, 2014.  (Tr. 20)

George challenges the ALJ's invalidation of his IQ scores and asserts that he meets Listing 12.05(C).  He also argues that the ALJ got her findings on his Residual Functional Capacity wrong by not including all of the necessary limitations found by the experts.  He perfunctorily asserts that the ALJ did not properly support her credibility finding.  The Commissioner argues that the ALJ fully supported her findings with substantial evidence.

## V.  Relevant Evidence

### A.  Treatment notes and evaluations

In 1996, at age 11, a school psychologist referred George for intelligence testing due to academic concerns.  (Tr. 243)  On the Wechsler Intelligence Scale for Children (WISC-III) test, George demonstrate a full-scale IQ score of 78 (FSIQ), verbal IQ (VIQ) score of 69, and performance IQ (PIQ) of 94 on the (R. 243).  The testing administrator opined that "[b]ecause [George] experienced such difficulties with the Verbal subtests of the WISC-III, this measure does not seem to be an accurate measure of his optimal intellectual performance."  (Tr. 245)  As a result, she administered a second test (KABC).  (Id.)  On the KABC test it was reported that George generally performed in the average range but was below or "well below" expectancy in his reading, writing, and expressive language skills.  (Tr. 245-46)  The school psychologist opined that George had an average intellectual ability but that there were "significant discrepancies between his abilities and his achievement" in the areas of reading, writing, and

expressive language. (Tr. 246) It was also noted at that time that George was taking Ritalin for treatment of ADHD. (Tr. 244)

In 2002, during George's 10th grade year, a school psychologist assistant reevaluated George for special education services. (Tr. 408-11) At that time, George obtained the following scores on the Wechsler Adult Intelligence Scale – Third Edition test ("WAIS III): FSIQ 75, VIQ 74, PIQ 46. (Tr. 416-18) His school also administered the Woodcock Johnson Tests of Achievement – Third Edition (WJ-III). George's WJ-III scores ranged from the low range to low average range. (Tr. 420) The assessment revealed comprehension as George's weakest area and math as a relative strength. (Tr. 421-22)

In 2010, George's aunt brought him to the doctor for concerns over his alcohol and drug abuse. (Tr. 288) It was noted that George had a history of cocaine, marijuana, and alcohol abuse. (Tr. 284-85) Although his doctor suggested therapy for his depression and substance abuse, George declined treatment at that time. (Tr. 285)

While incarcerated for a DUI in March 2011, George was evaluated by psychiatrist Otto Kausch, M.D. (Tr. 248-51) George reported that he took Ritalin up until tenth grade but stopped after developing a tic.[2] (Tr. 250) He also reported that he had previously tried Seroquel for his anger problems but was not on any psychiatric medication at the time of the evaluation. George reported using marijuana and alcohol regularly and stated that he tried cocaine on a few occasions. (Tr. 249-50) However, he stated that he had not smoked marijuana since January. (Tr. 249) He also reported a prior three month stay in a court substance abuse treatment center the previous year. (Tr. 249-50) Intelligence testing produced the following scores: 72 FSIQ, 63

---

[2] In January 2013, it was reported that George stopped taking Ritalin in tenth grade because he developed a tic of clearing his throat that was thought to be due to the Ritalin. (Tr. 317) It was noted that the tic did not go away after the Ritalin was stopped. (Id.)

VIQ, 86 PIQ.  (Id.)  Dr. Kausch diagnosed George with alcohol and cannabis dependence, and borderline intellectual functioning.  (Tr. 250)  He also opined that George qualified for the "Mentally Retarded Offender (MRO) Program."  (Tr. 251)

In November 2012, George reported achieving sobriety through AA meetings and drug rehabilitation.  (Tr. 254)   Beginning in December 2012 and through 2015, George sought mental health treatment at Far West Center (Tr. 310-26, 337-50, 370-91, 394-406).  George's aunt frequently accompanied him to appointments.  See e.g. (Tr. 348, 350, 399)

During a mental health assessment with Melissa Duda, LSW, in January 2013, George exhibited questionable memory and below average intelligence.  (Tr. 313)  He had poor insight and "extremely poor" judgment.  (Id.)  During another psychiatric assessment later that month, George reported isolationism, stating that he had no friends and was not close with his father or brother.  (Tr. 317)  Dr. Vazquez diagnosed George with ADHD, tick [*sic*] disorder, intermittent explosive disorder, mental retardation – mild, and mixed personality disorder.  (Tr. 320)  Dr, Vazquez prescribed Strattera for ADHD and Abilify for mood swings.  (Tr. 321)  Later that month George was "vague" about whether the medication improved his symptoms although his aunt thought it helped.  (Tr. 325)  His Strattera dosage was increased and he was told to return in four weeks.  (Id.)   In March 2013, George reported an "up and down" mood.  (Tr. 315)  At that time, George also reported heavily drinking, smoking marijuana daily, and using cocaine every month.  (Tr. 270)  He expressed that Abilify improved his anger, but that Strattera had not helped his attention and concentration yet.  (Tr. 323)

In April 2013, George reported that the Abilify helped him sleep and control his frustration and anger.  (Tr. 322)  He also reported smoking marijuana and drinking to treat his anxiety.  (Id.)  The dosage on his Strattera and Abilify were increased at that time.  (Id.) On May

20, 2013, George reported improved focus, as well as less anger and impulsivity, with medication. (Tr. 350) George applied for a landscaping job on his own. (Id.)

On May 31, 2013, George attended a consultative examination with Paul A. Deardorff, Ph.D., ABPP. (Tr. 329-36) At the time, George reported using alcohol twice weekly. (Tr. 331) He also reported taking Strattera and Abilify. (Id.) George reported employment as an eyeglasses assembler three years prior. (Id.) He stated that he had been fired for "running [his] mouth" and getting aggravated. (Id.) He also stated that he had problems with instructions and that anxiety interfered with his concentration. (Id.) Dr. Deardorff administered the Wechsler Adult Intelligence Scale – IV test. (Tr. 329) George obtained the following scores: FSIQ 68; Verbal Comprehension Index ("VCI") 70; Perceptional Reasoning Index ("PRI") 71; Working Memory Index ("WMI") 74; and Processing Speed Index ("PSI") 79. (Tr. 334) Dr. Deardorff expressed that George's tested IQ was "lower than would be expected on the basis of his clinical presentation" and suspected that "[e]motional facts very likely interfered with his performance…as he appear[ed] to be of borderline to low-average intelligence." (Id.)

In June 2013, George expressed that the Abilify helped with frustration and anger, but that Strattera had not made a difference in his attention and concentration. (Tr. 349) Grace Herwig, APRN, recommended he drop Strattera from his prescription regimen to determine if he noticed a difference. (Tr. 346, 49) George's Aunt reported at that time that his mood fluctuated depending on whether George took synthetic marijuana. (Id.) In July 2013, Far West staff reported that George still had a significant problem with his substance abuse. (Tr. 348)

In August 2013, Far West case manager Juanita Koch reported that George had been compliant with his psychotropic medications and that his medications provided symptom improvement. (Tr. 339-40, 47) Ms. Koch also reported that George had been very reliable and

had not missed any Far West appointments. (Tr. 339) At that time, it was also noted that George had limited motivation/energy, attention/concentration, and judgment/insight. (Tr. 347)

In early January 2014, George attended a psychiatric evaluation with Todd D. Hendrix, Ph.D., PCC-S. (Tr. 351-62) George demonstrated logical, coherent, and goal directed thought processes but had significant difficulty expressing himself. (Tr. 352) Intelligence testing yielded verbal and full scale scores of 68. (Tr. 353) A personality test revealed "subtle suggestions that [George] attempted to portray himself in a negative or pathological manner in particular areas." (Tr. 358) Dr. Hendrix opined that the personality test pattern "[did] not necessarily indicated a level of impression management that would render the test results uninterpretable." (Id.) But stated that George's "over-representation of symptoms may reflect an attempt to malinger or a cry for help." (Id.) Ultimately, Dr. Hendrix concluded that George appeared to provide his best efforts to all testing and Dr. Hendrix considered the results of the assessment as a whole to be valid and an accurate reflection of George's current level of functioning. (Tr. 361) Dr. Hendrix recommended George continue receiving psychiatric medication and obtain assistance with vocational training/placement and development of independent living skills. (Tr. 362)

Between January 2014 through January 2015, George continuously reported symptom relief with Abilify and therapy. (Tr. 376-99) George also reported frequently engaging in activities and spending times with friends and family including planned trips to Michigan, Arizona, and the waterpark. (Id.) George also enjoyed darts, video games, golf, and bowling. (Tr. 385) During the summer of 2014, George worked 1-2 days a week as a landscaper using a weed-whacker and blower. (Tr. 381, 385) George expressed a desire to obtain full-time employment, possibly as a firefighter. (Id.) Initially, George stated that he planned to shovel snow in the winter season but later stated that he would not work again until spring and would

hang out with friends and family until then.  (Tr. 378, 380)  In August 2014, George reported

being off drugs, but occasionally drinking alcohol.  (Tr. 380)

In April 2014, counselor Brenda Dillane completed a Mental Impairment Report.  (Tr.

363-66)  Ms. Dillane opined that George's difficulty with comprehension, verbal expression, and

inattention lead to anxiety.  (Tr. 363)  She also stated that George's primary concern was his

limited cognitive ability and that his others diagnoses were secondary to that.  (Tr. 364)  Ms.

Dillane stated that there had been no significant progress with George's limited intelligence,

insight, and judgment.  (Tr. 365)  She opined that his prognosis was poor.  (Id.)  Ms. Dillane

opined that George had moderate limitations in activities of daily living and marked limitations

in his social functioning and concentration, persistence, or pace.  (Tr. 366)

## B.    State Agency Opinions

In June 2013, Roseann Umana, Ph.D., a state agency psychologist, reviewed the medical

evidence and opined that George's mental impairments did not satisfy any listed impairment,

including Listing 12.05.  (Tr. 82-87)  She further opined that George had only mild restrictions I

in his activities of daily living and moderate limitations in maintaining social functioning and

concentration, persistence or pace.  (Tr. 83)  Dr. Umana concluded that George retained the

capacity to understand, remember and carry out simple instructions for routine repetitive tasks;

with superficial and occasional social interactions; and routine and predictable work duties.  (Tr.

85-87).

In September 2013, a second state agency psychologist, Ermias Seleshi, M.D., reviewed

George's evidence and concurred with Dr. Umana that George did not satisfy a listed

impairment.  (Tr. 97-99)  Dr. Seleshi noted improvement of George's symptoms on Abilify.  (Tr.

102)  He opined that George had moderate limitations in daily living; social functioning; and

maintaining concentration, persistence, and pace.  (Tr. 98)  He concluded that George retained

the ability to understand, remember and carry out simple instructions and perform two- to three

step simple, repetitive tasks without strict, fast-paced production requirements; with superficial

and occasional interactions with co-workers, supervisors and the general public; and routine and

predictable work duties.  (Tr. 100-02)

**C.    Testimonial Evidence[3]**

**1.    George's Hearing Testimony**

George testified at his February 2015 administrative hearing.  (Tr. 45-57) He stated that

he lived with his father.  (Tr. 45)  He informed the court of his driver's license suspension due to

multiple DUIs.  (Tr. 46)  He testified that he graduated from high school and that he worked full-

time in an eyeglass factory from 2006 to 2009 as a lens grinder.  (Id., 48)  He stated that the

company let him go due to a verbal altercation with another employee.  (Tr. 49)  When asked by

the ALJ why he felt he could not work, George replied, "I don't know."  (Tr. 50)  George

testified that he took Abilify daily and engaged in therapy for his mental health.  (Tr. 50-51)  He

testified that the Abilify helped "a little bit."  (Tr. 54)  George admitted to drinking alcohol a few

times a week and regularly using synthetic marijuana.  (Tr. 52, 53)

George's attorney then asked George about his anxiety.  (Tr. 54)  George stated that he

had panic attacks at times but had not had them for a while.  (Id.)  He testified that he had a

nervous coughing tic which caused anxiety and interfered with his ability to work.  (Id.)  When

asked how his anxiety interfered with his ability to work George stated that he did not know.

(Tr. 55)  George's counsel then questioned George about his difficulty with comprehension.  (Tr.

---

[3] In addition to George and George's aunt, Vocational Expert Ted Steven Macy also testified at the
hearing.  (Tr. 66-73)  Because that testimony is not relevant to the distinct issues raised in this action, I
am not summarizing it here.

55-56)  George stated that he got confused at his landscaping job and was "clueless of words" at the hearing.  (Tr. 56)  He stated that his aunt and dad helped him complete job applications. (Id.)  When asked if he knew what areas of job performance or work had been a problem for him in the past, George replied "I don't think so.  I don't know."  (Tr. 57)

### 2. George's Aunt's Hearing Testimony

George's aunt, Katherine Ann George, also testified at the hearing.  (Tr. 57-65)  She testified that George struggled with expressing himself and comprehension since childhood.  (Tr. 59)  She also testified about how she helped George fill out job applications, but stated that he did not do well in interviews because "[h]e can't even talk."  (Tr. 60)  She stated that George could generally take care of himself but struggled with cooking directions.  (Tr. 60-61)  George's aunt testified that George got "written up" several times during his employment at the eyeglass factory.  (Tr. 61)  She confirmed that George was not taking medication at that time but that, subsequently, Abilify had helped control his mood swings.  (Tr. 61-62)  She further testified that she managed George's money and that he needed constant reminders to get things done.  (Tr. 62-64)  She also opined that George could not live on his own.  (Tr. 64)

## VI. Law & Analysis

### A. Standard of Review

This court's review is limited to determining whether substantial evidence in the record supported the ALJ's findings of fact and whether the ALJ correctly applied the appropriate legal standards.  *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision.");  *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence

has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (*quoting Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The court must also determine whether the Commissioner applied proper legal standards. If not, the court must reverse the Commissioner's decision, unless the error of law is harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.     The ALJ's Listing Determination Requires Remand

George argues that the ALJ erred in finding that he did not satisfy Listing 12.05(C) for

intellectual disability. ECF Doc. No13, Page ID# 513-18. George takes issue specifically with the ALJ's determination that he did not have the requisite IQ scores to meet the listing. Id. Because I agree that the ALJ improperly invalidated George's IQ test scores, I am recommending remand.

At Step Three of the disability evaluation process, a claimant will be found disabled if he has an impairment or combination of impairments that meets or medically equals one of the listings in the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491 (6th Cir. 2010). Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing. 20 C.F.R. § 404.1525(c)(3), 416.925(c)(3). It is a claimant's burden to provide evidence that he satisfied all of the criteria to "meet" the Listing. Id.; *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Lusk v. Commissioner of Social Security,* 106 Fed.App'x. 405 (6th Cir.2004); *Evans v. Secretary of Health and Human Services,* 820 F.2d 161, 164 (6th Cir.1987).

George contends that he met all of the requirements of Listing 12.05,[4] including the subparagraph C requirement that he possess a valid verbal, performance, or full scale IQ of 60 through 70. ECF Doc. No. 16, Page ID# 464; 20 C.F.R. 404, Subpt. P, Appx. 1 § 12.05C. On the surface, George presented five scores within the listing range: (a) a 1996 verbal score of 69 (Tr. 243-47); (b) a 2011 verbal score of 63 (Tr. 248-51); (c) a 2013 full-scale score of 68 (Tr. 329-

---

[4] At the time of George's ALJ decision, Listing 12.05 contained two parts. The first part is referred to as the "diagnostic definition." To satisfy the diagnostic definition, a claimant must demonstrate: (1) significantly sub-average general intellectual functioning; (2) deficits in adaptive functioning; and (3) onset before age twenty-two. Id., § 12.05; *See also Hayes v. Comm'r of Soc. Sec.*, 357 Fed.App'x. 672, 675 (6th Cir.2009). The second part is referred to as the "severity criteria." In order to meet the severity criteria, a clamant must show that they meet the requirements stated in one of the subparagraphs of Listing 12.05. Here, George contends that she met the requirements of subparagraph C: (1) a valid verbal, performance, or full scale IQ of 60 through 70; and (2) a physical or other mental impairment imposing an additional and significant work-related limitation or function. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C); *Sheeks v. Comm'r of Soc. Sec.,* 544 Fed.App'x. 639, 641 (6th Cir.2013).

36); and (d) both verbal and full-scale scores of 68 in 2014 (Tr. 351-62).[5] Despite having

numerous scores meeting 12.05C's numerical threshold, the ALJ rejected each of these scores

for various reasons. (Id.) George challenges the ALJ's reasons for invalidating his 2011 and

2014 listing-level IQ scores.[6] ECF Doc. No.13, Page ID# 514.

### 1. Law Regarding Invalidation of IQ Test Scores

Intelligence tests assist in verifying the presence of an intellectual disability. *See* 20

C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 D(6)(a). However, "the results of intelligence test are

only part of the overall assessment." Id. "[T]he narrative report that accompanies the test results

should comment on whether the IQ scores are considered valid and consistent with the

developmental history and the degree of functional limitations." Id. For example, courts have

found IQ scores to be invalid based on the test subjects' bad faith during the examination. *See,*

*e.g., Shepherd v. Sullivan,* 889 F.2d 1088, at *4 (6th Cir.1989) (unpublished) ("IQ test was

invalid due to bad faith and malingering"); *see also Lipford v. Sec'y of HHS,* 762 F.2d 1009 (6th

Cir.1985) (unpublished). Yet, a bad faith finding is not required. Factors outside the test itself

can also provide proper bases for invalidation. *See e.g. McDonald v. Sec'y of HHS,* 786 F.2d

1165, at *13 (6th Cir.1986) (unpublished) ("Care should be taken to ascertain that test results are

consistent with daily activities and behavior" (quoting § 12.00B4).[2] "The regulations do not

limit the question of validity to test results alone in isolation from other factors." *Brown v. Sec'y*

*of HHS,* 948 F.2d 268, 269 (6th Cir.1991) ("The I.Q. score must reflect the plaintiff's true

abilities as demonstrated by his or her performance at work, household management and social

functioning. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 BC ... In assessing the validity of a

---

[5] Pursuant to 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(D)(6)(c), "where more than one IQ is
customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are
provided in the Wechsler series, we use the lowest of these in conjunction with 12.05."
[6] Notably George does not contest the ALJ's rejection of George's 1996 and 2013 listing-level IQ scores.

claimant's I.Q., 'information from both medical and nonmedical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands (stress).' 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 D.").

## 2. 2011 IQ Test

On March 22, 2011, George underwent intelligence testing during a psychological evaluation while incarcerated on a DUI charge. (Tr. 248-51) The testing resulted in a verbal score of 63, a performance score of 86, and a full-scale score of 72. (Tr. 250) Psychiatrist Otto Kausch, M.D., diagnosed George with borderline intellectual functioning based on George's full-scale IQ score. (Id.) He also determined that George's borderline intellectual functioning qualified him for the "mentally retarded offenders program." (Tr. 261)

The ALJ concluded that these scores were "not a valid reflection of [George's] true functioning abilities." (Tr. 24) The ALJ provided several reasons for invalidating George's scores. First, the ALJ explained that George's significant substance abuse problem at the time of testing impaired his functional performance. (Id.) Second, the ALJ opined that George's noncompliance with his psychiatric medication affected his functional performance. (Id.) Third, the ALJ found that George's presentation at the examination was not consistent with his verbal skills score. (Id.)

### a. Substance Abuse

Initially, the ALJ erred by rejecting – without evidentiary support – George's 2011 scores based on his substance abuse problem. Dr. Kausch was well aware of George's substance abuse at the time of testing as George was in jail on a DUI charge and Dr. Kausch recommended George receive treatment for alcohol and cannabis dependence. (Tr. 251) Despite this, Dr.

Kausch did not invalidate or question George's scores. In fact, no medical professional has ever offered a specific opinion regarding the effect of George's substance abuse on his intellectual abilities. Nevertheless, the ALJ concluded that George's "significant substance abuse problem at that time…likely impaired his functional performance." (Tr. 24) The ALJ is not qualified to make that determination without evidentiary support. *See Trent v. Astrue*, No. 1:09CV2680, 2011 WL 841538, at *6 (N.D. Ohio Mar. 8, 2011) (finding that "[t]he impact of alcohol on a mental condition is beyond the scope of [the ALJ's] area of expertise."); *Mathious v. Barnhart,* 490 F.Supp.2d 833, 847 n.14 (E.D.Mich.2007) ("The ALJ is not a medical doctor ... and is therefore not qualified to determine whether someone's functional limitations and IQ scores are the product of alcohol or drug usage without some competent evidence or more thorough explanation."); *Postell v. Comm'r of Soc. Sec.,* No. 14-11244, 2015 WL 5545554, at *10 (E.D. Mich. Aug. 6, 2015), *report and recommendation adopted,* No. CV 14-11244, 2015 WL 5545576 (E.D. Mich. Sept. 18, 2015) (finding that were there was no medical opinion evidence on the effect of plaintiff's alcohol abuse on her mental impairments, the ALJ was not qualified to make this determination).

In addition, had the ALJ chosen to do so, she could have sought follow-up opinions from the medical sources about whether George's drug use impacted his IQ test results. Or she could have enlisted the aid of an independent medical expert. She did neither.

The ALJ's analysis is also flawed because the decision does not indicate that she applied the relevant legal standards. Under the applicable federal law, "[a]n individual shall not be considered to be disabled [under the Social Security Act] if alcoholism or drug addiction would…be a contributing factor material to the Commissioner's determination that the individual is disabled." Pub.L.No. 104–121, 110 Stat. 847, 852–53 (1996), codified at 42 U.S.C. §§

423(d)(2)(C) and 1382c(a)(3)(J); See also 20 C.F.R. §§ 404.1535 and 416.935.  Social security

regulations provide the following procedure to determine the materiality of drug addiction and

alcoholism on the disability determination:

> How we will determine whether your drug addiction or alcoholism is a
> contributing factor material to the determination of disability.
>
> (a) General. If we find that you are disabled and have medical evidence of your
> drug addiction or alcoholism, we must determine whether your drug addiction or
> alcoholism is a contributing factor material to the determination of disability.
>
> (b) Process we will follow when we have medical evidence of your drug addiction
> or alcoholism.
>
> > (1) The key factor we will examine in determining whether drug addiction
> > or alcoholism is a contributing factor material to the determination of
> > disability is whether we would still find you disabled if you stopped using
> > drugs or alcohol.
> > (2) In making this determination, we will evaluate which of your current
> > physical and mental limitations, upon which we based our current
> > disability determination, would remain if you stopped using drugs or
> > alcohol and then determine whether any or all of your remaining
> > limitations would be disabling.
> > (i) If we determine that your remaining limitations would not be disabling,
> > we will find that your drug addiction or alcoholism is a contributing factor
> > material to the determination of disability.
> > (ii) If we determine that your remaining limitations are disabling, you are
> > disabled independent of your drug addiction or alcoholism and we will
> > find that your drug addiction or alcoholism is not a contributing factor
> > material to the determination of disability.

20 C.F.R. §§ 404.1535 and 416.935. "In other words, if the ALJ completes the five-step process

outlined above and determines that a claimant is disabled with substance abuse, the ALJ must

then proceed to conduct a second five-step analysis in order to determine if the claimant would

still be disabled without the substance abuse." *Trent v. Astrue,* 2011 WL 841538 at *3 (N.D.Ohio

2011) citing *Underwood v. Comm'r of Social Sec.,* 2010 WL 424970 at *6, *10 (N.D.Ohio

2010).  The burden of proving that substance abuse is not a material factor to the disability

determination rests with the claimant.  *Id.*; *Sarli v. Colvin*, 2015 WL 1419612 at * 18 (N.D. Ohio

Mar. 27, 2015). However, The ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding. *Underwood*, 2010 WL 424970 at *6. "If the ALJ is unable to determine whether substance use disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow." *Id.*, citing, *Fastner v. Barnhart,* 324 F.3d 981, 86 (8th Cir.2003); *see also Brueggeman v. Barnhart,* 348 F.3d 689, 693 (8th Cir.2003) ("In colloquial terms, on the issue of the materiality of alcoholism, a tie goes to [the claimant].").

Here, nothing in the decision reflects that the ALJ conducted a materiality analysis. Rather, the ALJ appears to have short-circuited the process and rejected IQ scores not based on medical evidence but on her own determination that George's substance abuse impacted his IQ scores. In *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 381 (6th Cir. 2013), the Sixth Circuit found that it was improper for the ALJ to factor claimant's alcohol abuse into the initial disability determination without conducting a materiality analysis. *See also Brown v. Massanari*, 9 F. App'x 570, 572 (8th Cir. 2001) (reversing the ALJ decision's for failure to determine what limitations would remand if claimant were not using alcohol). Based on all of the above, the ALJ's decision must be reversed because she injected her own lay opinion that substance use could have impacted George's IQ scores, did not seek the opinion of an independent medical source on that issue, and failed to apply the relevant legal standards Because of these issues, the ALJ's decision to invalidate George's IQ scores are not supported by substantial evidence.

### b.      Medication Noncompliance

The ALJ also invalidated George's 2011 IQ score because he didn't comply with his psychotropic medication regimen. The ALJ noted that, at the time of the testing, "George reported noncompliance with psychiatric medication." (Tr. 24) The ALJ determined that the

noncompliance "further diminishe[d] the validity of the claimant's intelligence scores because subsequent treatment records show that with medication compliance the claimant's functional abilities markedly improved." (Id.) However, as with the substance abuse issue, the ALJ was without substantial evidence or a thorough explanation to support her invalidation of George's IQ score due to medication noncompliance. (Tr. 24)

The ALJ relied on Exhibit 12F to support her conclusion that George's medication noncompliance impacted his intelligence testing. (Id.) Treatment notes within that exhibit demonstrate that medication and counseling reduced George's anxiety, anger, and increased his ability to concentrate. (Tr. 376 –85, 99; January 2014- January 2015). But the ALJ failed to paint an accurate and logical bridge as to how those improvements impacted George's intellectual capacity. In fact, during the same timeframe that George reported improvement of his anxiety, anger, and increase in concentration on Abilify, a therapist opined that George made "no significant progress" due to his "limited intelligence; insight and judgment." (Tr. 395) The therapist further opined that George's primary concern was his limited cognitive ability and that his other diagnoses were secondary to that. (Id.) Even assuming an improvement in George's functional capabilities, there is no evidence in the record that supports the conclusion that such improvements also mean that his IQ tests would have been higher. In particular, because George's 2011 Verbal IQ score was at the Listing level, the ALJ's reasoning did not paint a clear picture of how an improvement in concentration or the lessening of his anxiety and anger would necessarily improve George's verbal comprehension score.[7]

---

[7] Notably, the only intelligence testing done during a period of medication compliance in 2014 resulted in listing-level scores (a verbal and full scale score of 68), but the ALJ also invalidated those scores. These scores bear a mention, however, because, despite George's medication compliance, his IQ scores were essentially the same as when he was noncompliant.

### c.    Examination Presentation

Finally, the ALJ also invalidated George's 2011 IQ scores because his presentation at the examination was not consistent with his test scores.  The ALJ found:

> [George's] presentation at the examination also was not consistent with his verbal skills score, and rather, [was] more consistent with his performance scale score.  For example, while the claimant appeared cognitively limited to the examiner, the claimant's thoughts were logical, coherent, he presented as oriented and alert, and he was able to complete simple math problems.  Further, he denied behavioral and mood problems.

(Tr. 24)  Dr. Kausch made the following observations regarding George's examination presentation:

> [George] presented as a calm, cooperative male…His thoughts were logical and coherent. He denied currently experiencing any problems with this mood and there was no clinical evidence for any active mood disorder.  He denied any thoughts of harming himself or others.  He denied experiencing any hallucinations or paranoia.  The defendant appeared cognitively limited.  He said that previous testing showed that he had a "borderline I.Q." He reported problems thinking clearly and difficulties with comprehension.  He was oriented to person, place, and time.  He was able to do some simple subtraction problems.

(Tr. 250)    The ALJ's opinion that George's alertness, ability to express logical and clear thoughts, and complete simple math problems were inconsistent with his verbal IQ score is not supported by substantial evidence when the test administrator simultaneously noted that claimant appeared to be cognitively limited.  George accuses the ALJ of "cherry picking" the evidence. While I might not use such a pejorative term, it is hard to find fault with that basic contention. The ALJ picked what supported her conclusions while not adequately dealing with what did not. And, when necessary, the ALJ simply concluded what she believed must be true even in the absence of expert opinion support.

Based on all of the above, the ALJ's improper analysis of George's 2011 IQ scores requires remand for further development of these issues.[8]

---

[8] Although the Commissioner argues that George also failed to show deficits in adaptive functioning, as required to meet Listing 12.05(C), the ALJ failed to make a determination on that issue, presumably

### 3. 2014 IQ Scores

The preceding analysis provides a sufficient basis for remanding this case back to the Commissioner, particularly because George only needs one IQ score in listing range to meet his initial hurdle of proving he meets Listing 12.05(C). However, I will address the remaining arguments to ensure the proper evaluation of all issues on remand.

George asserts that the ALJ's rejection of his 2014 IQ scores also requires remand. The ALJ explained her rationale for invalidating the scores as follows:

> …[I]n January 2014, the claimant underwent intelligence testing with Dr. Todd Hendrix, Ph.D., which revealed verbal and full scale scores of 68. (Ex. 9F, p.3). Although Dr. Hendrix indicated that the results of the assessment are considered valid and an accurate reflection of his current level of functioning, Dr. Hendrix also indicated that there were subtle suggestions that the claimant "attempted to portray himself in a negative or pathological manner in particular areas," and that "[t]his over-representation of symptoms may reflect an attempt to malinger or a cry for help." (Id. at 3, 8). Dr. Hendrix further noted that the claimant's presentation was consistent with a diagnosis of mild intellectual disability, mild bipolar disorder, the clinical scales suggested a person with a history of polysubstance abuse, and that his substance abuse likely causes severe disruptions in his social relationships, work performance, and possible health complications. (Id. at 10-12). Moreover, during the examination, the claimant admitted that he occasionally engages in maladaptive behavior patterns aimed at controlling anxiety, such as drug and alcohol use; for which Dr. Hendrix noted that his alcohol and illicit drug abuse is comorbid with bipolar disorder. (Id. at 11-12). Based on this evidence, including the evidence of the claimant's true level of functioning as discussed above, I conclude that the claimant's verbal and full scale scores from January 2014 are not valid. In making this finding, I give great weight to Dr. Hendrix's opinion that the claimant over-represented his symptoms and may be a malingerer, because Dr. Hendrix thoroughly examined the claimant and his assessment that the claimant over-represented his symptoms is consistent with the evidence that the claimant has a higher level of functional ability than alleged.

(Tr. 25)

---

because she found that there were no valid qualifying IQ scores. Thus, this court will not engage in *post hoc rationalization* of that issue. *SEC v. Chenery Corp.,* 332 U.S. 194 (1947). (holding that a reviewing court, in assessing the decision of an administrative agency, must judge its propriety solely by the grounds invoked by the agency.). *Meech v. Comm'r of Soc. Sec.*, No. 1:12CV2134, 2013 WL 5406743, at *2 (N.D. Ohio Sept. 25, 2013)

Generally, it is appropriate for an ALJ to invalidate an IQ score based on the full reading of an accompanying narrative report. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 D(6)(a) ("The results of intelligence test are only part of the overall assessment…the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitations.") Here, Dr. Hendrix administered several psychological tests including the Personality Assessment Inventory ("PAI") and the WAIS-IV. Dr. Hendrix's full narrative report including a discussion of all of the psychological testing, as well as a mental health examination.

Although acknowledging that the Dr. Hendrix considered the WAIS-IV to be a valid and accurate reflection of George's current level of functioning, the ALJ gave great weight to a statement Dr. Hendrix made in interpreting the results of the PAI:

> [S]ubtle suggestions that [George] attempted to portray himself in a negative or pathological manner in particular areas, although the pattern does not necessarily indicated a level of impression management that would render the test results uninterpretable. This over-representation of symptoms may reflect an attempt to malinger or a cry for help.

(Tr. 358) The ALJ stated that she gave "great weight to Dr. Hendrix's opinion that claimant over-represented his symptoms and may be a malingerer." (Tr. 25) However, in summation of the entire evaluation, Dr. Hendrix indicated that George "appeared to provide his best efforts to all of the testing instruments, and the results of the assessment as a whole are considered to be valid and an accurate reflection of his current level of functioning." (Tr. 353, 361) Dr. Hendrix also stated that George "did not appear to try to present an unrealistic image of himself and responded accurately to items asked of him." (Tr. 353) Furthermore, Dr. Hendrix noted that George appeared to have significant difficulty expressing himself verbally and opined that his George's "vocabulary and receptive and expressive language skills appeared to be significantly

below average when compared to same age peers." (Tr. 352)   Thus, taking the narrative report as a whole, Dr. Hendrix's comments regarding potential malingering are equivocal at best and alone do not provide substantial evidence to support the ALJ's invalidation of George's IQ score. *See Dragon v. Comm'r of Soc. Sec.*, 470 Fed.Appx. 454, 462 (6th Cir. 2012) (noting that while the "ALJ may choose to disregard I.Q. scores that would normally lead to a finding of disability when those scores were undermined by a doctor's full evaluation," the ALJ in that case had erred in disregarding IQ scores because the full evaluation "served to reinforce the I.Q. scores, rather than undermine them."); *See also Crittendon v. Colvin*, No. CV 15-13845, 2016 WL 8261933, at *4 (E.D. Mich. Nov. 17, 2016), *report and recommendation adopted,* No. 15-13845, 2017 WL 661066 (E.D. Mich. Feb. 17, 2017) (finding the ALJ's decision to invalidate the claimant's IQ score based on the test administrator's comment that the claimant had shown poor effort during testing was improper where the administrator's full evaluation revealed that claimant was cooperative and consistently functioned within the intellectually deficient range); *Henderson v. Comm'r of Soc. Sec.*, No. 13-11503, 2014 WL 3827227, at *11-12 (E.D. Mich. Aug. 4, 2014), report and recommendation adopted, No. 13-11503, 2014 WL 3864568 (E.D. Mich. Aug. 5, 2014) (citing *Dragon* and concluding, "The same is true here, where Henderson's IQ scores are both consistent with his results on previous IQ tests and with the remainder of Dr. Van Horn's evaluation."); *Conwell v. Comm'r of Soc. Sec.*, No. 1:14-CV-810, 2015 WL 9872213, at *5 (S.D. Ohio Dec. 2, 2015), report and recommendation adopted, No. 1:14CV810, 2016 WL 234813 (S.D. Ohio Jan. 20, 2016) (substantial evidence did not support invalidating IQ scores because, "As in *Dragon,* in the instant case Dr. Griffiths' complete evaluation only served to reinforce the validity of Plaintiff's IQ scores, rather than to undermine them.").[9]  This provides an additional

---

[9] In addition to Dr. Hendrix's narrative report, the ALJ invalidated George's 2014 listing-level verbal and full scale IQ scores as inconsistent "with the claimant's true level of functioning as discussed above."

basis for remand and further supports plaintiff's "cherry picking" criticism.

### C.     RFC

Next, George argues that the ALJ failed to incorporate a "repetitive tasks" limitation into the RFC. ECF Doc. No. 13, Page ID# 518.   George's argument is not well taken.  Although the ALJ did not include the words "repetitive tasks" in the RFC, the RFC did provide that George could "tolerate only occasional exposure to changes in the work setting."  (Tr. 25)  A work setting with only occasional changes would necessarily involve repetitive tasks.  Thus, the distinction between "repetitive tasks" and "only occasional exposure to changes" would not undermine the ALJ's Step Five finding.

### D.     Credibility

George provided a two-sentence credibility argument, stating that no examiner or treating source doubted his credibility or claimed he was malingering and that his test results consistently fell within the same ranges from age 11 through 28.  ECF Doc. No. 13, Page ID# 521.  As an initial matter, "when claimants merely refer to issues in a perfunctory manner, unaccompanied by some effort at developed argumentation, the issue is deemed waived." *Collett v. Colvin*, No.

---

(Tr. 25)  An "ALJ need[s] to actually evaluate the evidence, compare it to… the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011).  Here despite reading the decision as a whole, without an explained conclusion, the undersigned cannot engage in meaningful judicial review of this issue. Although the ALJ's decision generally discusses George's functional capabilities, such as completing self-care activities, visiting with friends, completing unskilled labor, and finishing high school, many of these have been held insufficient to invalidate a listing-level IQ score. *See Dragon v. Comm'r of Soc. Sec.,* 470 F. App'x 454, 463 (6th Cir. 2012); *Brown v. Comm'r of Soc. Sec.,* 662 F. App'x 430, 435 (6th Cir. 2016).  Moreover, neither party discussed this issue in their briefing.  Case law makes clear that issues adverted to "in a perfunctory manner, unaccompanied by some effort at developed argumentation" should be deemed waived.  *Kennedy v. Comm'r of Soc. Sec.,* 87 Fed. App'x 464, 466 (6th Cir.2003); *McPherson v. Kelsey,* 125 F.3d 989, 995-96 (6th Cir. 1997).  It is axiomatic that where the argument is not raised by the parties at all, the issue is deemed waived.

CIV. 13-299-GFVT, 2015 WL 1276175, at *6 (E.D. Ky. Mar. 19, 2015) *quoting Kennedy v.*

*Comm'r of Soc. Sec.,* 87 Fed. App'x 464, 466 (6th Cir.2003) (internal quotations omitted).

However, to the extent George attempts to bolster the credibility of his IQ tests and

examinations, that issue was addressed in the undersigned's discussion of George's Listing 12.05

argument.[10]  George's minimal credibility argument provides no independent basis for remand.

## VII.    Recommendation

The ALJ's invalidation of George's IQ scores at Step Three was not supported by

substantial evidence and did not apply the applicable regulatory standards.  Accordingly, I

recommend that the final decision of the Commissioner be VACATED and REMANDED,

pursuant to 42 U.S.C. §405(g) for further proceedings consistent with this Report and

Recommendation.

Dated: June 15, 2017

Thomas M. Parker
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may waive the right to appeal the District Court's order.  See
*U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985),
reh'g denied, 474 U.S. 1111 (1986).

---

[10] The undersigned further notes that the ALJ's decision finding George "only partially credible" is
supported by substantial evidence.  The ALJ's decision notes several inconsistencies between George's
alleged level of disability and his admissions in function reports and therapy records.  (Tr. 29-31)